IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DIGITAL GROUP, LLC,                    )
                                       )
        Plaintiff,                     )
                                       )        NO. 3:19-cv-01008
v.                                     )        JUDGE RICHARDSON
                                       )
HYPER NETWORKS, INC.,                  )
                                       )
        Defendant.                     )
                                       )
                                       )
                                       )

## MEMORANDUM OPINION

Pending before the Court is Defendant's "Partial Motion for Summary Judgment" (Doc. No. 55, "Motion") and a supporting Memorandum of Law (Doc. No. 56). Plaintiff responded (Doc. No. 60) and Defendant filed a reply (Doc. No. 65-1). The Motion is ripe for review.

For the reasons stated herein, Defendant's Motion will be **GRANTED in part** and **DENIED in part**.

## FACTUAL BACKGROUND[1]

The present action stems from a contract between Plaintiff and Defendant. Plaintiff, Digital Group, LLC, is a Tennessee company specializing in infrastructure and security system design. (Doc. No. 36 at 1-2). Defendant, Hyper Networks, Inc., is a Florida company specializing in information technology and the provision of telecommunication design, engineering, and

---

[1] Unless otherwise noted, the facts and contentions referred to in this section are taken from Plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Doc. No. 63) and Defendant's Response to Plaintiff's Statement of Additional Material Facts (Doc. No. 64). Facts that are stated herein without qualification are undisputed and treated as such. Alleged facts that are qualified here in some way (as for example by being prefaced with "Plaintiff contends that") are in dispute and are treated as such.

installation services. (*Id.* at 2). Throughout the relevant period, Defendant had a contract with Google Fiber to install fiber optic cable in Raleigh, North Carolina. (Doc. No. 63 at 1). Defendant subcontracted some of the work to Plaintiff starting in June 2019. (*Id.* 1, 5). Plaintiff often subcontracted labor through a company called TekSystems, which would perform the subcontracted work. (*Id.* at 5).

Plaintiff and Defendant (collectively, "the Parties") entered into three contracts: (1) an Independent Contractor's Agreement (the "Independent Contractor's Agreement") on June 19, 2019, (2) an Independent Contractor's Master Services Agreement (the "MSA") on July 31, 2019, and (3) a Hyper Networks, Inc. Subcontractor Addendum for Google Fiber Work (the "Addendum") on July 31, 2019. (*Id.* at 1-2). Under these agreements, pricing for particular work performed by Plaintiff was to be set forth in in purchase orders, statements of work, or work authorizations. (*Id.* at 2). The MSA and the Addendum required that any modifications to the agreements be made in writing. *(Id.* at 3).

Several months into starting work for Defendant, Plaintiff realized that labor costs were higher than anticipated. (*Id.*). In turn, in October 2019, Plaintiff directed its laborers not to incur any overtime on Defendant's project without approval. (*Id.* at 6). At the time, Plaintiff was behind schedule. (*Id.* at 7). When Plaintiff informed Defendant that it would no longer allow its workers to work overtime (including any weekend work) at the rates previously agreed upon, Defendant began looking for additional labor from other sources. (*Id.* at 7). In limited instances, Defendant hired Plaintiff's employees or one of Plaintiff's subcontractors for such work. (*Id.*). In the second half of October 2019, Defendant paid TekSystems employee Chris Shackleford directly for a single day of additional work. (*Id.*). Defendant paid him his usual hourly rate. (*Id.* at 8)

On October 19, 2019, Kelly Zakany (an employee of Plaintiff) met Patrick Chung (the owner of Defendant). (*Id.* at 13, Doc. No. 56 at 10, 17). Defendant offered Ms. Zakany a job on October 22, 2019. (Doc. No. 63 at 13). She started work for Defendant on November 1, 2019. (*Id.*).

Also in October 2019, Plaintiff sought to negotiate payments for losses associated with downtime[2], and prepared change order requests to submit to Defendant for that purpose. (*Id.* at 6). Later, Plaintiff sent invoices to Defendant for said downtime. (*Id.*) However, on October 30, 2019, Defendant issued a "stop work" directive to Plaintiff and asked that it return Defendant's materials. (*Id.* at 8).

## PROCEDURAL BACKGROUND

Plaintiff filed the present action on November 14, 2019, bringing the following claims: Count I for Breach of Contract; Count II for Inducement of Breach of Contract; Count III for Unfair Trade Practices; Count IV for Conversion/Theft of Services; Count V for Civil Conspiracy; and Count VI for Unjust Enrichment. Defendant filed the present Motion, seeking summary judgment on aspects of Count I for Breach of Contract and on the entirety of Counts II, III, IV and V.

## STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

_____

[2] The Court understands "downtime" to refer to lengths of time where Plaintiff's employees were meant to be working but were unable to do so due to various obstacles at the job sites that needed to be cleared or handled first and were not within Plaintiff's control. (Doc. Nos. 36 at 3, 56 at 3).

247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018). Accordingly, Courts (appropriately) at times refer interchangeably to a party being able to raise a genuine issue as to fact and a reasonable jury being able to find in the party's favor as to that fact, and this Court does likewise.

It is typically stated that the party bringing the summary judgment motion (the movant) has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *See, e.g. Johnson v. Ford Motor Co*., 13 F.4th 493, 502 (6th Cir. 2021) ("At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." (quoting *White v. Baxter Healthcare Corp*., 533 F.3d 381, 389–90 (6th Cir. 2008))); *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018). But this is somewhat inexact in the aftermath of 2010 amendments to Rule 56. The movant's initial burden actually is to demonstrate the absence of a genuine issue of material fact, and not necessarily to so demonstrate specifically by referencing portions of the record. True, prior to the 2010 amendments, referencing portions of the record seemed to be the only way to make such a demonstration, and even today that is the

primary way to make such a demonstration.[3] But the 2010 amendments added, *inter alia* Rule 56(c)(1)(B), which "recognizes that a party need not always point to specific record materials." Rule 56 2010 Amendment Advisory Committee Note.

Under Rule 56(c)(1)(B), the movant actually has another available means—an alternative to *citing materials in the record*—for demonstrating the absence of a genuine issue of material fact. Specifically, the moving party may meet its initial burden (to indicate the absence of a genuine issue of material fact) by "show[ing]"—even without citing materials of record—that the nonmovant "cannot produce admissible evidence to support [a material] fact" (for example, the existence of an element of a nonmovant plaintiff's claim). *See* Fed. R. Civ. P. 56(c)(1)(B).[4]

If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628.

## DISCUSSION

### I.       Choice of Law

When exercising diversity jurisdiction, the Court applies the choice-of-law principles of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Centra, Inc. v. Estrin*, 538 F.3d 402, 409 (6th Cir. 2008). Here, Tennessee is the forum state.

---

[3] Under current Rule 56, a party asserting that a fact cannot be or genuinely is disputed—*i.e.*, a party seeking summary judgment and a party opposing summary judgment, respectively—still can (and typically does) attempt to support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. *See* Fed. R. Civ. P. 56(c)(1)(A).

[4] More specifically, Rule 56(c)(1)(B), as added in 2010, provides in pertinent part that a "party asserting that a fact cannot be or is genuinely disputed must support the assertion by showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). This means, specifically in the case of a party asserting that a fact *cannot be* genuinely disputed (which typically would be the summary judgment *movant*), that its assertion can be supported by "show[ing]"—even without citing materials of record—that the adverse party (typically the *non-movant*) cannot produce admissible evidence to support the fact.

Under Tennessee choice-of-law principles, absent a choice-of-law clause, "a contract is presumed to be made with reference to the law of the place where it was entered into[.]" *Williams v. Smith*, 465 S.W.3d 150, 154 (Tenn. Ct. App. 2014) (citing *Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn. 1973)); *see also Evans v. Walgreen Co.*, 813 F. Supp. 2d 897, 915 (W.D. Tenn. 2011), *aff'd*, 559 F. App'x 508 (6th Cir. 2014) ("For contract claims, Tennessee follows the rule of *lex loci contractus*, which provides that a contract is presumed to be governed by the law of the jurisdiction in which it was executed, absent a contrary intent." (citation omitted)). However, when a choice-of-law clause is present, "Tennessee will honor [it] if the state whose law is chosen bears a reasonable relation to the transaction and absent a violation of the forum state's public policy." *Bright v. Spaghetti Warehouse, Inc.*, No. 03A01-9708-CV-00377, 1998 WL 205757, at *5 (Tenn. Ct. App. Apr. 29, 1998) (quoting *Arcata Graphics v. Heidelberg Harris*, 874 S.W.2d 15 (Tenn. Ct. App. 1993)).

In the present case, the MSA contains the following provision, "This agreement shall be deemed to be made under and shall be construed in accordance with the laws of the State of North Carolina, exclusive of any choice of law or conflicts rules." (Doc. No. 55-3 at 10, ¶ 27). North Carolina, as the location for execution of work in the contract, is reasonably related to the transaction. The Court will therefore apply North Carolina law to any contract-related claims challenged in the Motion.

Additionally, under Tennessee's choice-of-law principles, tort actions are governed by the "most significant relationship" approach. *See Nixon v. Waste Management, Inc.*, 156 F. App'x 784, 787 (6th Cir. 2005) (citing *Hataway v. McKinley*, 830 S.W.2d 53, 59 (Tenn. 1992)). Under that approach, courts should generally apply "the law of the state where the injury occurred." *Hataway*, 830 S.W.2d at 57 (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 146 and

175 (1971)). As the injuries alleged in Plaintiff's Second Amended Complaint appear to the Court to have all occurred in North Carolina, North Carolina is the state with the most significant relationship to Plaintiff's challenged tort claims.

Additionally, neither Party appears to dispute the application of North Carolina law to any aspect of the case. Accordingly, the Court will apply North Carolina law in making its determination on the Motion.

## II.    Plaintiff's Claim for Breach of Contract

Defendant acknowledges that there is a genuine dispute as to certain facts material to some parts of Plaintiff's claim for breach of contract that preclude summary judgment as to the whole claim. (Doc. No. 56 at 9). However, Defendant also argues that there are aspects of the claim, primarily regarding Defendant's alleged liability for particular kinds of alleged damages, that the Court "can and should decide" at the summary judgment stage. (*Id.*). Defendant's argument, that it is entitled to summary judgment as to its contractual liability for particular kinds of damages, is essentially one for a kind of partial summary judgment as to Count I. But a threshold question is whether it is a *proper* request for partial summary judgment—*i.e.* a request for a kind of partial summary judgment that a district court actually is authorized to grant.

It is one thing to move for "partial" summary judgment in the sense of requesting summary judgment as to one or more claims in their entirety but fewer than all claims. This kind of partial summary judgment motion is relatively straightforward.

It is quite another thing to move for "partial" summary judgment in the sense of requesting summary judgment as to *part of a single claim.* But Rule 56 expressly authorizes the latter kind of motion for partial summary judgment. Fed R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense —or *the part of each claim* or defense —on which

summary judgment is sought."). And, not surprisingly, it likewise authorizes (and indeed requires) the Court to grant such a motion if the summary-judgment standard is satisfied. *See id.*

The latter kind of partial summary judgment is potentially more confusing because it implicates the issue of what exactly is meant by a "part of [a] claim." The issue is significant because it governs what kinds of things—being properly deemed a "part of a claim"—can potentially be resolved in the movant's favor via a grant of partial summary judgment under Rule 56. Can a "part of a claim" mean an item of damages sought via a claim? A particular factual theory, included among others, of liability on a claim? A particular legal theory, included among others, of liability on a claim? A question of pure fact underlying a claim? An isolated purely legal issue underlying a claim?

When a court parses a single count too finely in pronouncing a purported partial summary judgment, it risks granting summary judgment as to something that is too fragmentary to properly be deemed even "a part of a claim" (so as to be potentially subject to summary judgment in the first place). Relatedly, a court parsing a claim too finely risks pronouncing a purported (partial) summary *judgment* on something that really is not susceptible to "judgment" in the traditional sense. For example, a court may be tempted to pronounce (partial) summary judgment on one of multiple theories underlying a single count, but it should think twice before doing so, because *judgment* typically is entered on *claims*, rather than on individual *theories* supporting a claim or on discrete "issues." On the other hand, so doing would be authorized to the extent the theory is properly deemed "a part of the claim."

Here, the Court need not delve exhaustively into the questions it has raised. It is enough to say that Defendant's request for summary judgment as to particular kinds of damages claimed by Plaintiff in Count I seems to be a request for summary judgment on "part of" Count I. Thus, even

though Defendant in places characterizes its request as one for summary judgment as to "issues"[5]—which causes the Court concern because typically mere discrete "issues" are something too fragmentary to be subject to summary judgment—the Court easily concludes that Defendant actually is seeking summary judgment as to each of a number of "parts of the claim" for breach of contract set forth in Count I. Satisfied that the Motion, with respect to Count I, includes an appropriate request for partial summary judgment, the Court addresses in turn Defendant's argument as to various parts of Count I.

> A.  <u>Defendant will be granted summary judgment on Plaintiff's claim for payment on labor downtime.</u>

Plaintiff alleges in Count I that Defendant breached the Agreement by "failing to pay valid and timely-submitted invoices in the amount of $374,996.25 and $38,000 in labor downtime, for a total of $412,996.25." (Doc. No. 36 at ¶ 27). After alleging (in a single sentence in the next paragraph) another way in which the contact was breached, Plaintiff alleges that "[Plaintiff] has suffered monetary damages as a result of [Defendant]'s breaches of the Agreement." (*Id.* at ¶ 29). Then, in the Prayer for Relief, Plaintiff requests an award of damages in an amount "not less than $412,996.55." (*Id.* at 12). So it is clear that Plaintiff is seeking, among other things, $38,000 in what Plaintiff itself has called (alleged) "labor downtime." It is equally clear that Plaintiff is seeking the $38,000 as damages for (and solely for *breach of contract*).

Defendant's first argument for summary judgment as to Count I is that Plaintiff cannot seek damages for the claimed unpaid "labor downtime" (in the amount of $38,000) to which Plaintiff refers in Count I. (Doc. No. 1 at 8). Defendant cites to the MSA, which reads,

---

[5] For example, Defendant writes, "While there are disputed material facts relevant to some of matters pertaining to Digital's breach of contract claim, there are several issues relevant to that claim that the Court can and should decide at this stage." (Doc. No. 56 at 8).

> All work will be issued from Company to Contractor in either the form of a Scope of Work (SOW), Purchase Order (PO), or Work Authorization (WA). These forms of issued work will herein be called the 'Scope of Work.' Company will have no obligations to Contractor for work not duly authorized in one of these three forms.

(Doc. No. 55-3 at 1). The MSA also reads that "No modification or amendment hereto shall be effective unless made in writing, signed by the party to be charged." (Doc. No. 55-3 at 10). The Addendum says that any changes to the scope of work, or prices "may be modified only as expressly set forth in a written document." (Doc. No. 55-4 at 6). Defendant also cites to the deposition testimony of Michael Bohannon, Plaintiff's current President, where he acknowledged that he was not aware of any written agreement between the Parties to pay labor downtime, but that it was "discussed in emails and correspondence." (Doc. No. 55-8 at 7). The Court believes that Defendant thus has satisfied its initial burden to show a lack of genuine dispute as to whether Plaintiff is entitled to payment for "labor downtime."

Plaintiff makes two arguments in an effort to prove that its claim for labor downtime should survive summary judgment. The first is that "the downtime charges asserted by [Plaintiff] are basic delay damages, recoverable as general damages in a construction contract case under general principles of contract law, unless they are specifically prohibited in the contract." (Doc. No. 60 at 18). Plaintiff makes clear that (at least in its view) "delay damages" are awardable (if awardable) not based on breach of contract, but rather entirely irrespective of any contract. (*Id.* at 19). This argument is frivolous because, as discussed above, it is entirely clear that Plaintiff claimed the downtime charges as (and only as) damages for breach of contract—meaning, under Plaintiff's own theory, something entirely distinguishable from delay damages. Making even clearer how baseless Plaintiff's argument here is, if such were even necessary, is the fact that the Second Amended Complaint does not even include the phrase "delay damages" (and for that matter even

the word "delay"), let alone any explanation of how or why "delay damages" would be recoverable. In short, it is entirely clear that Plaintiff's claim in Count I for the labor downtime (in the amount of $38,000) is not a claim for delay damages. A plaintiff is not permitted to add a new claim in response to summary judgment. *See Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) ("Once a case has progressed to the summary judgment stage, therefore, 'the liberal pleading standards under *Swierkiewicz* and [the Federal Rules] are inapplicable.'" (quoting *Gilmour v. Gates, McDonald & Co.,* 382 F.3d 1312, 1315 (11th Cir. 2004))); see also *Tchankpa v. Ascena Retail Grp., Inc*., 951 F.3d 805, 817 (6th Cir. 2020); *Renner v. Ford Motor Co*., 516 F. App'x 498, 504 (6th Cir. 2013) ("It is well-settled that a plaintiff may not expand its claims to assert new theories in response to summary judgment or on appeal."). The Court therefore determines that Plaintiff did not initially bring a claim for "delay damages" pursuant to Count I and cannot assert one in its response to Defendant's Motion.

Plaintiff's second, alternative, argument is that Defendant actually agreed to pay for labor downtime. As evidence of this, Plaintiff cites to an email between Ryan Zakany, an employee of Defendant, and Darren Johnson, another employee of Defendant. In the email, Mr. Zakany writes, "[Plaintiff] is not comfortable working [overtime] as [it] lost money on 117A . . . What they are asking us for is if they hit a stopping point that is not caused by their own actions, th[en] we will cover the lost production."[6] (Doc. No. 60-11 at 1). Johnson replies, "Approved." (*Id.*). Plaintiff provides no evidence that Johnson's alleged approval was ever conveyed to Plaintiff in any form, which at a minimum would be required for Defendant to have "agreed"—*i.e.*, have an agreement with Plaintiff—to pay for labor downtime. Moreover, Plaintiff provides no other evidence to

---

[6] It is clear that the reference to 117A is a reference to some piece of work done by Plaintiff; the Court gathers that 117A may have been the name given to a particular stretch where fiber optic cable was installed.

clarify Johnson's duties or scope of responsibilities, or to explain why Johnson would be authorized to bind Defendant via the kind of internal approval he gave here, such that his email response could qualify as an amendment "made in writing, signed by the party to be charged" in accordance with the MSA. (Doc. No. 55-4 at 6). It is not enough that he is some kind of supervisor (as alleged by Plaintiff without supporting evidence (Doc. No. 60 at 19)) who purported to approve something; it is axiomatic that even if an individual is an employee (perhaps even a supervisor) of a corporation, the individual generally cannot bind the corporation as to matters outside the scope of the individual's employment. The principle is quite straightforward and easily illustrated with a simple example: a first-tier supervisor at a giant corporation is not necessarily legally capable of binding the corporation to a $1 billion contract merely by purporting to "approve" a subordinate's proposal for such a contract, because authorization to approve such a major proposal actually may exist only higher in the ranks of the corporation. Plaintiff does nothing to establish the scope of Johnson's agency and whether it covers the purported approval at issue here.

As the Court finds both Plaintiff's responsive arguments insufficient to suggest a genuine dispute of material fact, Defendant's Motion will be granted to the extent it seeks to bar Plaintiff from bringing claims for unpaid labor downtime.

> **B.** <u>Defendant will be granted summary judgment on Plaintiff's claim for "lost profits."</u>

Defendant argues that Plaintiff should be denied recovery of unpaid compensation for work that was included in a scope-of-work order between the Parties, but ultimately not completed once Defendant directed Plaintiff to cease working. Though Defendant acknowledges that a claim for this is not expressly set forth in the Second Amended Complaint, Defendant contends that Plaintiff has suggested it will pursue these amounts at trial. (Doc. No. 56 at 11 (citing Doc. No. 55-8 at 10)). Asserting that the Court should grant summary judgment as to this part of Count I, Defendant cites

the MSA, which expressly provides that "[i]n no event shall the [Plaintiff] be entitled payment for any work required by the Agreement but not completed in full . . . ." (Doc. No. 55-3 at 10, § 25). Defendant argues, "Under that provision, Digital plainly agreed that it would not be reimbursed for work that it did not complete, and summary judgment as to Digital's claim relating to such amounts should be granted on that basis, alone." (Doc. No. 56 at 11). The Court finds this is sufficient evidence to suggest a lack of genuine dispute as to the question of whether Plaintiff is entitled to payment for uncompleted work.

Plaintiff responds that it is simply seeking "lost profits," as it is (at least generally) entitled to under North Carolina law. As support for this contention, Plaintiff cites to *Hassett v. Dixie Furniture Co.*, 425 S.E.2d 683, 685 (N.C. 1993), which says, "[a] party injured by a breach of contract is entitled to be placed in the same position he would have occupied if the contract had been performed, insofar as this can be done by an award of money damages." And, according to Plaintiff, to be placed in the same position it would have otherwise been, it must "be awarded lost profits." (Doc. No. 60 at 20).

The Court notes that Plaintiff is correct that a "party injured by a breach of contract is entitled to be placed in the same position he would have occupied if the contract had been performed." *Hassett*, 425 S.E.2d at 685. However, in North Carolina, parties are free to contract away the right to lost profits. *See Meineke Car Care Centers, Inc. v. RLB Holdings, LLC*, 423 F. App'x 274, 280 (4th Cir. 2011) ("While the parties were certainly free to contract for liquidated damages or to bar a right to recover lost profits under North Carolina law, they did not do so in this case."). Here, the Court believes it is clear that Plaintiff in the present case did just that,

contracting away its right to seek lost profits for uncompleted work.[7] *See Cone Mills Corp. v. Allstate Ins. Co.*, 443 S.E.2d 357, 359 (N.C. Ct. App. 1994) ("Where the policy language is clear and unambiguous, the court's only duty is to determine the legal effect of the language used and to enforce the agreement as written."). Plaintiff has cited to no evidence suggesting the MSA provision waiving the right to payment for uncompleted work (or lost profits) has been superseded or amended. Accordingly, Defendant's Motion will be granted as it relates to Plaintiff's recovery of lost profits for uncompleted work.[8]

    C.    <u>Defendant will be granted partial summary judgment on its so-called "offset."</u>

Defendant's final summary judgment argument as to Count I is that the Court should find as a matter of law that Defendant is entitled to an "offset" related to Plaintiff's breach-of-contract claim. (Doc. No. 56 at 14). Defendant argues that Plaintiff is in possession of certain materials

---

[7] The Court notes that this concept of uncompleted work is distinct from the concept of work that was *done* but was part of a work order that ultimately went unfinished. It appears that some or all of Plaintiff's claim for unpaid invoices fit into the latter category. The Court's determination here reflects only that Plaintiff cannot seek lost profits based on work that it actually never did but *allegedly would have done and indeed completed* had not the Agreement (allegedly) been breached via Defendant's alleged wrongful termination of it.

[8] Defendant additionally argues that the Court should grant summary judgment as to any request by Plaintiff for "consequential damages" relating to the breach-of-contract claim. (Doc. No. 56 at 12-13). Plaintiff's response states that it is "not seeking consequential damages for breach of contract," but is instead seeking only "lost profits" that would place it "in the same position that it would have been had the contract been performed." (Doc. No. 60 at 21-22). The Court acknowledges the possibility that under North Carolina law, some or all of the lost profits claimed by Plaintiff would not constitute "consequential damages." *Medfusion, Inc. v. Allscripts Healthcare Sols., Inc*., No. 14 CVS 5192, 2015 WL 1455680, at *5 (N.C. Super. Mar. 31, 2015) (stating that if the Court were to adopt the plaintiff's interpretation of a particular contractual clause at issue, "[the [p]laintiff would only be excluded from recovering lost profits that are consequential damages," but would not be precluded from recovering lost profits "[t]o the extent lost profits constitute direct damages"). But the Court has already determined that Plaintiff contracted away the right to seek lost profits, thus lost profits are not recoverable even if they are not "consequential damages." For this reason, and because Plaintiff disavows seeking any consequential damages (including any consequential damages that are not lost profits), the Court need not further consider Defendant's argument for "consequential damages."

belonging to Defendant, and failed to "promptly return" said materials, as required by the MSA.

(*Id.*). To support this argument, Defendant cites to the MSA, which states,

> Materials: The Company shall furnish to Contractor all hardware and other materials specifically set forth in the Scope of Work on Exhibit B (the "Materials") in sufficient quantities to complete the Services. Contractor hereby acknowledges and agrees that:
>  . . . .
>
> e. If Contractor shall fail to promptly return any unused Materials in good order, lose, damage or otherwise cause to be unsuitable for future installation any materials issued, the Company shall have the right to collect from Contractor a monetary amount equal to the fair market value of the Materials that Contractor has failed to return, account for, or return damaged plus an administrative fee of fifteen ten [sic] percent (15%).

(Doc. No. 55-3 at 4, ¶ 13). Defendant also cites to the declaration of Ryan Zakany, where Mr. Zakany states that the day Defendant issued a stop-work order to Plaintiff, Defendant also asked Plaintiff to return "any of Hyper's materials" that Plaintiff had in its possession. (Doc. No. 55-1 at 2). The declaration also contains Mr. Zakany's averment that "Digital has not returned those materials," *id.*, and attaches an exhibit (Doc. No. 55-5) detailing an inventory of all the materials allegedly still in Plaintiff's possession and the estimated cost of $112,711 to replace those materials. Defendant contends that, in accordance with the MSA, it is entitled to an offset of the fair market value of the materials still in Plaintiff's possession, plus a 15 percent administrative fee.

Before determining if Defendant has satisfied its initial burden, the Court must review the nature of an "offset" and how (if at all) it might apply in the present case. As one North Carolina court noted, an offset (or "setoff") "is defined as '[a] defendant's counterdemand against the plaintiff, *arising out of a transaction independent of the plaintiff's claim.*'" *In re Se. Eye Ctr.-Pending Matters*, No. 15 CVS 1648, 2016 WL 4163928, at *7 (N.C. Super. July 22, 2016) (quoting *Setoff*, BLACK'S LAW DICTIONARY (10th ed. 2014) (emphasis added)). Whereas, a recoupment

(another defense) "is defined as a '[r]eduction of a plaintiff's damages because of a demand by the defendant *arising out of the same transaction.*'" *Id.* (quoting *Recoupment*, BLACK'S LAW DICTIONARY (10th ed. 2014) (emphasis added)); *see also Gen. Elec. Co. v. Williams*, 31 S.E. 288, 289 (N.C. 1898) ("[T]he set-off was of statutory origin, and applied only to mutual, independent claims; the defendant's claim necessarily arising out of a transaction extrinsic to the plaintiff's cause of action.").

 "On the [other hand], *recoupment* always arises out of the same cause of action, or matters directly connected therewith, and was recognized at common law." *Id.* (emphasis added). "Recoupment 'allows a defendant to "defend" against a claim by asserting—up to the amount of the claim—the defendant's own claim against the plaintiff growing out of the same transaction.'" *RL Regi North Carolina, LLC v. Lighthouse Cove, LLC*, 748 S.E.2d 723, 728 (N.C. Ct. App. 2013) (quoting *Bolduc v. Beal Bank, SSB*, 167 F.3d 667, 672 (1st Cir. 1999)), *reversed and remanded on other grounds by* 762 S.E.2d 188 (N.C. 2014)). The Court concludes the more accurate term for Defendant's defense is one of "recoupment" because on balance it can fairly be said to arise out of matters directly connected with one or more of Plaintiff's causes of action.[9]

With that rather technical (not to say immaterial) question behind it, the Court turns to whether Defendant has pointed to sufficient facts to suggest a lack of genuine dispute as to whether it is entitled to a recoupment for the materials Plaintiff failed to return. Based on the evidence discussed above, the Court easily concludes that Defendant has done so.

---

[9] Under North Carolina law, a recoupment appears to be a hybrid of a defense and counterclaim. *See Hurst v. Everett*, 91 N.C. 399, 403-04 (1884) (a "counter-claim includes every defence to the action . . . It therefore includes recoupment and set-off, and yet neither of these is a counter-claim in the strict sense of the term. . . . Where the counter-claim does not pray for relief against the plaintiff, it is not a cross-action, but may be either a set-off or recoupment.") (cited positively by *Settlers Edge Holding Co., LLC v. RES-NC Settlers Edge, LLC*, 793 S.E.2d 722, 732 (N.C. Ct. App. 2016)). Here, for ease of reference, the Court will refer to recoupment as a defense.

Plaintiff makes multiple arguments in response. First, Plaintiff argues that Defendant committed the first material breach of the contract and therefore "cannot enforce" other contractual obligations against Plaintiff. (Doc. No. 60 at 23 (citing *Crescent Univ. City Venture, LLC v. AP Atl., Inc.*, No. 15 CVS 14745, 2019 WL 3765313, at *10 (N.C. Super. Aug. 8, 2019) ("As a general rule, if either party to a bilateral contract commits a material breach of the contract, the non-breaching party is excused from the obligation to perform further."))).[10] Plaintiff contends that Defendant breached the contract by "refusing to pay hundreds of thousands of dollars in invoices," by "paying others to pull fiber in Sections where [Plaintiff] had a binding purchase order," and by "ordering [Plaintiff] to stop work for no good reason." (*Id.* at 24). The Court does not believe the MSA provision requiring the return of materials or a penalty for non-returned and/or damaged materials is properly deemed a requirement for Plaintiff to "perform" under the MSA for purposes of *Crescent Univ. City Venture, LLC*'s rule that excuses the non-breaching party from "perform[ing]" further. As written, the relevant provision—¶ 13.e of the MSA—does not purport to require Plaintiff to do anything. Rather, it merely provides Defendant with the right to recover certain amounts if Plaintiff does not do something. Specifically, under the MSA, if provided materials are not "promptly returned" to Defendant, Defendant has the right to recover a "monetary amount" of fair market value plus fifteen percent from Plaintiff.[11] The provision could have been

---

[10] As is relevant below, *Crescent Univ. City Venture, LLC* here makes clear that what the non-breaching party is relieved from is the obligation to *perform* further.

[11] Presumably, Plaintiff would argue that the effect of this provision is the same as the effect of a contractual requirement, *i.e.*, that it is liable to pay something to Defendant if it fails to do something. That is fair enough, as far as it goes. But an examination of *what specifically Plaintiff would be liable for* reveals that this MSA provision does not set forth an *obligation to perform*. If the MSA did set forth an obligation to perform, Plaintiff's breach of such obligation would render Plaintiff at least potentially liable for the full range of possible remedies for breach of contract, including specific performance, actual damages, and consequential damages. But as Plaintiff would surely agree, Defendant here is contractually limited to one remedy if Plaintiff does not return the materials: payment of the specified amount.

written differently, but as written it serves merely to contractually allocate to Plaintiff the financial risk that Defendant does not receive back its materials promptly and in good shape.

Plaintiff next argues that the "covenant of good faith and fair dealing" (hereinafter, "covenant") "prohibit [Defendant's] invocation of the fair market value [recoupment] for retained materials." (Doc. No. 60 at 25). The Court finds that this argument is underdeveloped. Plaintiff states that "[a]t no time during this process did [Defendant] indicate it was going to exercise its contractual [recoupment] right." (*Id.*). However, this is insufficient to indicate bad faith on the part of Defendant. Moreover, citing to no case law and almost no factual support, Plaintiff fails to explain what, under North Carolina law, the covenant is and how it is breached. Plaintiff fails to expand on how the covenant, even if it was breached and could aid Plaintiff in some way in this litigation, serves specifically as a defense to Defendant's assertion of recoupment. This argument fails accordingly.

Plaintiff's final argument in response to Defendant's assertion of recoupment is that the amount of materials in its possession, and their fair market value, is genuinely disputed. (Doc. No. 60 at 26). As support for this, Plaintiff cites to the declaration of Buck Thrailkill (who is Plaintiff's

---

Conceivably, Plaintiff might argue that the provision actually is one providing for liquidated damages for the breach of an obligation to perform, but the Court would disagree. The provision rather conspicuously omits the term "liquidated damages." More to the point, under North Carolina law, the provision does not qualify as a provision for liquidated damages. "Liquidated damages are a sum which a party to a contract agrees to pay or a deposit which he agrees to forfeit, if he breaks some promise, and which, having been arrived at by a good-faith effort to estimate in advance the actual damage which would probably ensue from the breach, are legally recoverable or retainable . . . if the breach occurs." *Green Park Inn, Inc. v. Moore*, 562 S.E.2d 53, 58 (N.C. Ct. App. 2002) (internal quotation marks omitted). As suggested above, the MSA does not set forth any "promise" to return the materials to Defendant, so the provision does not set forth any agreement by Plaintiff to pay anything for breaking that promise. And there is no language suggesting that the payment (in particular the 15 percent "administrative fee") represents a good-faith estimate of actual damages for the non-return of the materials. Relatedly, unlike some provisions that initially appear arguably to call for liquidated damages but actually call for an (unenforceable) penalty, *see id.*) the MSA provision does not prescribe a *penalty*, because it does not prescribe "a *punishment,* the threat of which is designed to prevent the breach." *Id.* (internal quotation marks omitted).

Representative (Doc. No. 56 at 22)), which says the Defendant's inventory list "does not accurately reflect the materials" Plaintiff has in its possession, and that the reasonable fair market value is estimated at $23,760. (Doc. No. 62 at 1). Included with Thrailkill's declaration is a quote from GraybaR (a wholesale supplier for similar materials as the ones at issue) estimating the cost of purchasing the same new materials Plaintiff acknowledges it (still) possesses. (Doc. No. 62-1).

Upon consideration of Plaintiff's responsive arguments, the Court finds there is no genuine dispute that Plaintiff is liable to Defendant for a recoupment on the non-returned materials. However, the Court finds that there is a genuine dispute of fact related to the amount of materials, the fair market value of said materials, and whether or not Defendant is entitled to the additional fifteen percent penalty (which Defendant itself acknowledges is a remaining question in its reply (Doc. No. 65-1 at 13)). Accordingly, Defendant will be granted summary judgment as to its asserted defense of recoupment, but the exact amount of said recoupment is a factual issue that remains for trial.

### III.    Plaintiff's Claims for Inducement of Breach of Contract and Conversion

Defendant argues that it is entitled to summary judgment on Plaintiff's Count II (Inducement to Breach of Contract) and Plaintiff's Count IV (Conversion/Theft of Services) in their entirety. Plaintiff concedes that "there is insufficient evidence to support [its] claim for inducement of breach of its contract with TekSystems" and that "it cannot establish a claim for conversion/theft of services." (Doc. No. 60 at 27-28). Thus, Plaintiff clearly has abandoned (conceded) Count IV.

As for Count II, Plaintiff's Second Amended Complaint grounds its claim for Inducement of Breach of Contract on Defendant's alleged inducement (i) of TekSystems to breach its contract with Plaintiff, and (ii) of Kelly Zakany and Marquinslo Bynum to breach their employment

contracts with Plaintiff. Plaintiff clearly has abandoned (conceded) the first aspect of this claim, relating to TekSystems. Though Plaintiff's concession refers only to TekSystems, Plaintiff fails to otherwise address the claim as it relates to Kelly Zakany or Maquinslo Bynum, as to which Defendant also sought summary judgment (Doc. No. 56 at 19-23). Where a party fails to respond to an argument, "the Court assumes he concedes this point and abandons the claim." *PNC Bank, Nat. Ass'n v. Goyette Mech. Co., Inc.*, 88 F. Supp. 3d 775, 785 (E.D. Mich. 2015) (quoting *Mekani v. Homecomings Fin., LLC*, 752 F. Supp. 2d 785, 797 (E.D. Mich. 2010)). Accordingly, based on Plaintiff's apparent complete abandonment of Count II and Count IV, the Court will grant summary judgment to Defendant as to Count II and Count IV in their entirety.

## IV.      Plaintiff's Claim for Unfair Trade Practices

Defendant next argues that it should be granted summary judgment on Plaintiff's claim for Unfair Trade Practices, which was brought under North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"). (Doc. No. 56 at 23). The UDTPA reads, "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. Ann. § 75-1.1(a). Defendant contends that Plaintiff has not alleged any conduct that would constitute an "unfair or deceptive" trade practice, which (according to Defendant) requires a showing of "substantial aggravating circumstances." (Doc. No. 56 at 24 (quoting *Broussard v. Meineke Disc. Muffler Shops, Inc*., 155 F.3d 331, 347 (4th Cir. 1998))). In fact, Defendant argues, "[in] this case, the only alleged conduct by Hyper that even arguably qualifies as a 'substantial aggravating circumstance' [and therefore an unfair or deceptive trade practice] . . . is the allegation that Hyper conspired with Ms. Zakany and Mr. Bynum to steal or 'divert' Digital's labor." *(Id.).*

In discussing how to analyze claims under the UDTPA, the North Carolina Court of Appeals has stated:

> Unfair competition has been referred to in terms of conduct "which a court of equity would consider unfair." Thus viewed, the fairness or unfairness of particular conduct is not an abstraction to be derived by logic. Rather, the fair or unfair nature of particular conduct is to be judged by viewing it against the background of actual human experience and by determining its intended and actual effects upon others.

*Harrington Mfg. Co. v. Powell Mfg. Co*., 248 S.E.2d 739, 744 (N.C. Ct. App. 1978) (quoting *Carolina Aniline & Extract Co. v. Ray*, 20 S.E.2d 59, 61 (N.C. 1942)).

Contrary to Defendant's contention that Plaintiff alleged only one instance of conduct that could qualify as an unfair or deceptive trade practice, the Court believes Plaintiff's Second Amended Complaint alleges multiple possible instances of unfair or deceptive trade practices. A non-exhaustive list of examples includes the following alleged facts from Plaintiff's Second Amended Complaint: "[A]lthough Hyper would make no complaint about Digital Group's work and would 'approve' its invoices – thereby enticing Digital Group into continuing to perform work on the project – Hyper would ultimately not pay Digital Group for its work", and "Shortly after wrongfully terminating its agreement with Digital Group, Hyper hired Ms. Zakany, as well as Mr. Shackelford, Mr. Bynum, and many of the other workers who had performed work for Digital Group, either directly or through Digital Group's contract with Teksystems." (Doc. No. 36 at 3-4, 7). The Court believes these alleged facts provide a possible basis for Plaintiff's UDTPA claim and went unaddressed by Defendant's Motion.

As Defendant failed to address all potential bases for Plaintiff's UDTPA claim, it failed to carry its initial burden to show preliminarily a lack of genuine dispute as to a material fact. The Court will deny Defendant's Motion as to Plaintiff's claim under the UDTPA.

## V.    Plaintiff's Claim for Civil Conspiracy

Defendant's final argument is that it should be granted summary judgment as to Plaintiff's claim for civil conspiracy. Defendant correctly notes[12] that civil conspiracy is not a stand-alone cause of action, and that instead, "liability for civil conspiracy must be alleged in conjunction with an underlying claim for unlawful conduct." *Am. Air Filter Co., Inc. v. Price*, No. 16 CVS 13610, 2018 WL 3466952, at *12 (N.C. Super. July 10, 2018) ( citing *Toomer v. Garrett*, 574 S.E.2d 76, 92, (N.C. Ct. App. 2002)). As the North Carolina Supreme Court has stated:

> "A civil action for conspiracy is an action for damages resulting from acts committed by one or more of the conspirators pursuant to the formed conspiracy, rather than the conspiracy itself." *Burton v. Dixon*, 259 N.C. 473, 476, 131 S.E.2d 27, 30 (1963). "To create civil liability for conspiracy there must have been a wrongful act resulting in injury to another committed by one or more of the conspirators pursuant to the common scheme and in furtherance of the objective." *Ridgeway Brands*, 362 N.C. at 444, 666 S.E.2d at 115 (quoting *Henry v. Deen*, 310 N.C. 75, 87, 310 S.E.2d 326, 334 (1984) ). This is because a "conspiracy charged does no more than associate the defendants together and perhaps liberalize the rules of evidence to the extent that under the proper circumstances the acts of one may be admissible against all." *Henry*, 310 N.C. at 87, 310 S.E.2d at 334 (first citing *614 Shope v. Boyer*, 268 N.C. 401, 150 S.E.2d 771 (1966); then citing *Muse v. Morrison*, 234 N.C. 195, 66 S.E.2d 783 (1951) ).

*Krawiec v. Manly*, 811 S.E.2d 542, 550 (N.C. 2018). "In short, civil conspiracy is premised on the underlying wrongful acts, and liability attaches only if one of the conspirators is liable for an underlying tort." *Krawiec v. Manly*, No. 15 CVS 1927, 2016 WL 374734, at *13 (N.C. Super. Jan. 22, 2016) (internal citations quotation marks omitted), *aff'd as modified and remanded*, 811 S.E.2d 542 (N.C. 2018). In other words, civil conspiracy is less a "claim" and more a *theory* for extending

---

[12] Defendant mistakenly cites Tennessee case law for its argument on civil conspiracy. (Doc. No. 56 at 25-26). However, the Tennessee case law cited by Defendant plainly mirrors North Carolina case law quoted by the Court above. Because Tennessee law and North Carolina law treat civil conspiracy substantively the same, the Court can treat Defendant's argument as if it was supported (appropriately) by citations to North Carolina law.

tort liability for the acts of each conspirator (committed during and within the scope of the conspiracy) to every other co-conspirator.

Defendant argues that if summary judgment is granted as to Plaintiff's claims for inducement of breach of contract, unfair trade practices, and conversion (as Defendant seeks in this Motion) then "summary judgment should also be granted in favor of [Defendant] as to the conspiracy [theory]" since Plaintiff would lack a surviving underlying tort claim upon which a civil conspiracy could act. However, because the Court has determined that Plaintiff's claim for unfair trade practices will survive Defendant's Motion, Defendant's argument for summary judgment as to Plaintiff's civil conspiracy theory is inapplicable to that claim.[13] *See Am. Air. Filter Co. Inc.*, 2018 WL 3466952, at * 12 ("Since [plaintiff's] claims for misappropriation and unfair trade practices survive dismissal, these claims can serve as the requisite underlying torts for a civil conspiracy claim."). As Defendant makes no separate argument attacking Plaintiff's theory of civil conspiracy, Defendant's Motion will be denied as to Plaintiff's theory of civil conspiracy.[14] *Glover Constr. Co., Inc. v. Sequoia Servs., LLC*, No. 18 CVS 1900, 2020 WL 3393065, at *19 (N.C.

---

[13] True, Defendant's argument is applicable to Plaintiff's claims as to which the Court has granted summary judgment. But the Court need not address Defendant's arguments with respect to those claims, because the civil conspiracy theory is simply inapposite to those claims anyway, since a civil conspiracy theory—which serves specifically to extend to all co-conspirators liability for torts committed by any co-conspirator—cannot possibly operate in connection with tort counts that have been dismissed.

[14] Defendant includes an additional one-line argument stating, "summary judgment is appropriate due to [Plaintiff]'s inability to identify any damages stemming from the alleged conspiracy." (Doc. No. 56 at 26). However, as noted above, civil conspiracy serves to extend liability (for damages, primarily) from a tort-feasing co-conspirator to the other co-conspirators. The damages at issue are damages from the underlying tort, not damages from the civil conspiracy. *See Ivey v. McDaniel (In re EBW Laser, Inc.),* No. 05–10220C–7G, No. 05–10221C–7G, Adversary No. 07–2004, 2009 Bankr.LEXIS 70, at *30 (Bankr. M.D.N.C. Jan. 15, 2009) ("North Carolina law does not recognize a claim merely for civil conspiracy, but does recognize a claim for damages caused by acts carried out pursuant to a conspiracy."). In other words, a plaintiff does not need to show damages from the conspiracy (the agreement) itself, as opposed to damages from the underlying tort on which the civil conspiracy theory can operate to extend liability. Therefore, it is a red herring to argue that Plaintiff needed to separately allege damages from the civil conspiracy distinct from the damages claimed from the (alleged) underlying torts.

Super. June 18, 2020) ("With regard to [the plaintiff]'s causes of action for civil conspiracy, [the d]efendants only argue that these claims fail because the underlying tort claims under which these claims arise fail. The Court already has concluded that [the plaintiff] has produced evidence that could support claims for breach of fiduciary duty and misappropriation of trade secrets . . . . To the extent [that the defendant] seeks judgment in their favor on [the plaintiff]'s claims for civil conspiracy . . . , the [d]efendants' [summary judgment m]otion should be DENIED." (internal citations and quotation marks omitted))

## CONCLUSION

For the reasons discussed herein, Defendant's Motion (Doc. No. 55) will be **GRANTED in part** and **DENIED in part**. Specifically, the Motion will be GRANTED as to part of Count I (Breach of Contract), *i.e.,* granted insofar as Plaintiff seeks via Count I damages based on payments for labor downtime, lost profits/uncompleted work, and consequential damages, as well as Defendant's defense of recoupment (but not as to the specific amount of the recoupment). Moreover, the Motion will be GRANTED as to Count II (Inducement of Breach of Contract) and Count IV (Conversion/Theft of Services) in their entirety. The Motion will be DENIED as to Plaintiff's Count III (Unfair Trade Practices) and Count V (Civil Conspiracy).

An appropriate order will be entered.

*Eli Richardson*

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE